## UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

**ROCHELLE V. THOMAS**,

               Plaintiff,

   vs.

**WELLS FARGO BANK, N.A.**,
c/o Corporation Service Company
40 Technology Parkway South, Suite 300
Norcross, GA 30092

             Defendant.

Civil Action File No.

_____

**COMPLAINT FOR DAMAGES**

**JURY TRIAL DEMANDED**

Plaintiff Rochelle V. Thomas ("Thomas"), through counsel, states as follows for her complaint against Defendant Wells Fargo Bank, N.A. ("Wells Fargo"):

## PARTIES, JURISDICTION, AND VENUE

1.     Thomas was the owner of residential real property, located at and commonly known as 5869 Strathmoor Manor Cir., Lithonia, GA 30058 (the "Property") which she occupied as her primary, principal residence until January 31, 2014.

2.     Thomas is a natural person residing in DeKalb County, Georgia at her residence of 5642 Saint Thomas Drive, Lithonia, GA 30058.

3.      Wells Fargo is a federally chartered National Banking Association that is organized and exists under the National Banking Act, with its principal place of business located in Sioux Falls, South Dakota. Wells Fargo is subject to the supervision of the Comptroller of the Currency of the United States Department of the Treasury and is deemed a citizen of South Dakota pursuant to 28 U.S.C. § 1348.

4.      Wells Fargo executes contracts across the United States and in the State of Georgia, including the loans at issue with the Property in DeKalb County, Georgia. Wells Fargo regularly engages and transacts substantial business across the State of Georgia.

5.      Venue lies in this district pursuant to 28 U.S.C. § 1391(b) as a substantial part of the events or omissions giving rise to the claims asserted herein occurred in this district.

## NATURE OF THE CASE

6.      Thomas suffered from Wells Fargo's uniform and automated "faulty calculation" errors, which caused Wells Fargo to wrongfully deny loan modifications to hundreds of consumers, many of whom lost their homes to foreclosure.

7.      Wells Fargo, as one of the largest lending and loan servicing institutions, services residential home mortgages. Wells Fargo also provides

mortgage loan modification services to borrowers who have defaulted on their mortgage.

8.    Wells Fargo is a loan servicer and lender. It derives income in a number of ways including: Payments based on a percentage of each borrower's principal balance pool; float interest; late fees; foreclosure fees; property inspection and preservation fees; and broker opinion fees.

9.    Wells Fargo is a wholly owned and controlled subsidiary of Wells Fargo & Company ("WFC"), one of the nation's largest financial institutions. WFC is a Delaware corporation headquartered in San Francisco, California and a registered bank holding company.

10.    WFC describes itself as a "diversified, community-based financial services company with $1.87 trillion in assets." Wells Fargo & Company, Quarterly Report Pursuant to Section 13 or 15(d) of the Securities Exchange Act of 1934 (Form 10-Q), p. 3, (Nov. 6, 2018). It provides "banking, investment, and mortgage products and services as well as consumer and commercial finance, through 8,050 locations, 13,000 ATMs, digital (online, mobile, and social), and contact centers (phone, email, and correspondence)." *Id.* WFC employs approximately 262,000 full-time employees in 37 countries and serves "one in three households in the United States." *Id.*

11.     Wells Fargo utilizes uniform and standardized loan servicing, loan modification, and foreclosure practices nationwide. Much of Wells Fargo's uniform and standardized loan servicing, loan modification, and foreclosure practices rely upon automated processes, systems, and tools.

12.     Wells Fargo uses proprietary mortgage loan modification tools to perform automated calculations and determine whether defaulted borrowers are eligible or qualified for loan modifications under Government Sponsored Enterprise ("GSE") and federal agency requirements.

13.     Wells Fargo's loan servicing, loan modification, and foreclosure practices are governed by federal requirements and obligations.

14.     The Fair Housing Agency (FHA) is an agency within the United States Department of Housing and Urban Development (HUD) that supplies mortgage insurance to FHA-approved lenders, insuring loans on single-family homes.

15.     Mortgage insurance protects lenders from the risk of borrower defaults because the FHA agrees to pay lenders in the event of borrower default. Lenders must be pre-approved to qualify for FHA mortgage insurance and lenders and servicers like Wells Fargo must also comply with HUD regulations.

16.     Wells Fargo is a pre-approved lender who qualifies for and at all times relevant did qualify for FHA mortgage insurance. Wells Fargo is therefore required

4

to comply with HUD regulations. For loans that are protected by FHA mortgage insurance, Wells Fargo and borrowers executed loan documents that incorporate by reference HUD regulations.

17.     In 2008, the federal government began the Troubled Asset Relief Program (TARP). Pursuant to TARP, all servicers that receive funding from TARP must participate in the FHA Home Affordable Modification Program (HAMP).

18.     Wells Fargo received about $25 billion in TARP funds. In return, Wells Fargo agreed to participate in HAMP and be obligated by all HAMP provisions, regulations, directives, guidelines, procedures, documentation, instructions, bulletins, frequently asked questions, letters, directives, and other communications issued by the Department of Treasury, GSEs, and federal agencies ("Program Documentation").

19.     In 2009, the Secretary of the Treasury implemented HAMP, which was designed to minimize foreclosures by incentivizing loan modifications. Pursuant to HAMP, HUD has promulgated HAMP guidelines, regulations, and directives.

20.     All servicers of any loan guaranteed or owned by a GSE or government agency must comply with all Program Documentation. Program Documentation obligations are voluntary for servicers of loans that are not guaranteed or owned by a GSE or government agency unless that servicer has executed a Service

Participation Agreement. Stated otherwise, once a servicer elects to participate, all program standards become mandatory. HAMP incentivizes servicers to execute Service Participation Agreements.

21.    On April 13, 2009, Wells Fargo entered into a Servicer Participation Agreement with the federal government. The Servicer Participation Agreement incorporates all Program Documentation and requires Wells Fargo to comply with all Program Documentation with a high professional standard of care.

22.    In short, Wells Fargo is required to comply with all Program Documentation, HAMP, and other Department of Treasury directives in addition to the requirements under HUD regulations for FHA approved lenders. Among other things, Wells Fargo is required to review defaulted loans for modification eligibility prior to proceeding with any foreclosure. Wells Fargo is required to offer all defaulted borrowers modifications for which they are eligible prior to conducting any foreclosure. HAMP guidelines require Wells Fargo undertake a number of specific and non-discretionary steps to determine a consumer's eligibility for modification or other relief. If, after completing a formula-driven net present value analysis, the modified loan would be more profitable than the non modified loan, HAMP guidelines require Wells Fargo offer a trial period plan modification. If the

borrower completes the trial period plan, Wells Fargo is required to permanently modify the loan.

23. To request a modification, the Program Documentation requires each borrower submit standardized form assistance applications, financial worksheets, hardship affidavits, acknowledgment, and agreements (the "Modification Contract"). Pursuant to the standard form Modification Contract, the borrower makes a legal representation as to the material truth of all information provided. The borrower agrees to provide all requested financial and hardship information. Among other things, the borrower also promises to undergo credit counseling if they are requested. In return, Wells Fargo agrees in the Modification Contract to examine the borrower's eligibility for all available modifications. If the borrower is eligible for any available mandatory modifications, Wells Fargo is required by the Modification Contract (as well as HAMP and other Department of Treasury directives) to extend a trial period plan.

24. These standardized Modification Contracts incorporate all applicable obligations in the Program Documentation.

25. In all relevant communications with borrowers, Wells Fargo represents that it will extend trial period plans to any borrower who is eligible for a mandatory modification under GSE guidelines and HAMP.

26.     Wells Fargo receives incentive payments for every successful modification under the Program Documentation. However, Wells Fargo also benefits from unsuccessful modifications, along with foreclosures. If a federally mandated modification is not required, Wells Fargo can offer modification and temporary payment plans outside of HAMP, often under terms that are less favorable to the borrower than federally-mandated plans. Further, Wells Fargo can continue to obtain fees from foreclosure activities, late payments, property inspections, property preservation, and broker's price opinions. Wells Fargo also receives higher float interest payments for non-modification options such as a short sale or a foreclosure. It further receives higher principal balance pool payments if it does not reduce the principal balance pursuant to Program Documentation requirements.

27.     Between 2010 and 2018, Wells Fargo failed to detect multiple systematic errors in its automated decision-making tool. This software determined borrowers' eligibility for government-mandated mortgage modifications during a time of extreme financial distress. Its importance to these borrowers' lives cannot be overstated. Yet, Wells Fargo not only failed to verify that its software was correctly calculating whether borrowers met threshold requirements for a mortgage modification, it failed to regularly and properly audit the software for compliance

with government requirements—allowing life-changing errors impacting borrowers, including Thomas, to remain uncorrected for years on end.

28.     Wells Fargo was not required to develop its own tool to calculate whether borrowers were eligible for government-mandated mortgage modifications. The government provided a free software tool for mortgage servicers to use in determining whether borrowers met threshold requirements. If Wells Fargo was not going to properly verify and audit its own software, it could have—and should have—used the free software instead.

29.     As a result of Wells Fargo's deficient auditing and compliance procedures, Wells Fargo repeatedly violated HAMP and other government requirements over a period of at least eight years and denied borrowers for trial loan modifications that Wells Fargo was legally required to offer.

30.     Wells Fargo failed to use appropriate auditing and compliance procedures even after a 2010 investigation by the Office of the Comptroller of the Currency (OCC) found numerous deficiencies in Wells Fargo's mortgage modification and foreclosure practices.

31.     The OCC found, among other things, that Wells Fargo had failed to devote adequate oversight to its foreclosure processes, failed to ensure compliance with applicable laws, and failed to adequately audit its foreclosure procedures.

32.     Wells Fargo agreed to correct these deficiencies in two 2011 consent orders. Wells Fargo pledged in the consent orders to maintain adequate governance and controls to ensure compliance with HAMP, to engage in ongoing testing for compliance with HAMP, and to ensure that its mortgage modification and foreclosure practices were regularly reviewed with any deficiencies promptly detected and remedied. Wells Fargo also promised to maintain a compliance committee of board members to monitor its ongoing compliance with the consent orders.

33.     In one of the consent orders, the Federal Reserve ordered Wells Fargo to take steps to ensure that it complies with its obligations under the consent orders, including, strengthening oversight of compliance with HAMP and other government requirements, ensuring that audit and compliance programs were adequately staffed, and improving compliance information and reports.

34.     Wells Fargo was supposed to make sure that it conducted the necessary testing to detect and remedy any violations of HAMP and other government requirements. Wells Fargo repeatedly failed to fulfill these obligations over the course of several years—in violation of the promises it made in the 2011 consent orders and in callous disregard of the well-being of borrowers.

35.     Four years after Wells Fargo agreed to the terms of the 2011 consent orders, in June 2015, the OCC found that Wells Fargo was still in continuing noncompliance. Among other things, the OCC found that Wells Fargo had not maintained ongoing testing for compliance with HAMP and other government requirements, not ensured that its audit and compliance programs had the requisite authority and status so that deficiencies in mortgage modification and foreclosure practices would be identified and promptly remedied, and not ensured that it was making reasonable good faith efforts, consistent with HAMP and other government requirements, to modify delinquent mortgage loans and prevent foreclosures of borrowers' homes.

36.     In response to Wells Fargo's ongoing violations of the 2011 consent orders, the OCC prohibited Wells Fargo, and its parent company, Wells Fargo & Company ("WFC"), from growing its residential mortgage servicing business until it brought its operations into compliance with an amended consent order. The OCC also stated that it would be taking additional action against Wells Fargo, the nature and severity of which would depend on the nature, length, and severity of Wells Fargo's continued noncompliance with the amended consent order.

37.     As a result of Wells Fargo's continuing failure to implement adequate auditing and compliance procedures, Wells Fargo failed to catch an error in its

mortgage modification software that led it to wrongly deny mortgage modifications to 184 customers between March 2013 and October 2014. The OCC specifically noted this error in its May 24, 2016 order requiring WFC to pay a civil money penalty of $70 million. WFC accepted the $70 million penalty and acknowledged the error that led Wells Fargo to wrongly deny mortgage modifications to 184 customers in 2013-2014.

38.    Indeed, unbeknownst to the OCC or to Thomas, Wells Fargo had discovered another error in its mortgage modification software in August 2013—which caused Wells Fargo to wrongly deny mortgage modifications to an additional 625 customers. Wells Fargo and WFC decided not to disclose that Wells Fargo had discovered this error—likely as part of an effort to avoid a larger penalty from the OCC, ensure that the OCC would terminate its supervision under the 2011 consent orders and lift the business restrictions it had imposed in 2015, and to avoid civil liability to those wronged homeowners.

39.    To make matters worse, even after discovering the 2013 error, Wells Fargo continued using the faulty mortgage modification software to assess borrowers' eligibility for modification options for more than two years. Wells Fargo did not implement new controls until October of 2015 and it did not disclose the error to federal regulators or the public until August of 2018.

40.    Moreover, despite discovering the error in 2013 and eventually implementing new controls in 2015, Wells Fargo still did not reform its auditing and verification practices. Related errors that would affect an additional 245 customers were not discovered, remedied, or disclosed until 2018.

41.    Wells Fargo's failure to implement adequate auditing and compliance procedures was not an accident. As scandal after scandal comes to light, it has become all too clear that Wells Fargo and WFC intentionally abandoned their oversight responsibilities—and did so to a shocking degree. And until they were caught red handed, they concealed those failures.

42.    Wells Fargo repeatedly promised to reform its central oversight as part of its settlements with the government. Each time, it failed to live up to those promises and continued to abdicate its oversight responsibilities. As the OCC stated in April 2018, "Since at least 2011, the Bank has failed to implement and maintain a compliance risk management program commensurate with the Bank's size, complexity and risk profile," which has "caused the Bank to engage in reckless unsafe or unsound practices and violations of law.[1]

---

[1] *See In re: Wells Fargo Bank, N.A.*, O.C.C. Consent Order #2018-025 at p. 2, https://www.occ.gov/static/enforcement-actions/ea2018-025.pdf (April 20th, 2018).

43.     Wells Fargo's persistent failure to implement adequate auditing and compliance procedures has grown so flagrant and resulted in so many consumer abuses that, in February 2018, the Federal Reserve Board announced that it would prohibit its WFC from expanding its business until it sufficiently improves its governance and controls.

44.     In its cease and desist order, the Federal Reserve Board found that Wells Fargo and WFC had pursued a business strategy that emphasized sales and growth without ensuring that senior management had maintained an adequate risk management framework, which resulted in weak compliance practices.

45.     WFC was ordered to submit a plan for reforming oversight and governance, including steps that it will take to hold senior management accountable, maintain a management structure that promotes effective oversight and compliance control, and ensure the comprehensive reporting necessary to oversee Wells Fargo's execution of its compliance control program.

46.     WFC was also ordered to submit a plan for reforming its firm-wide compliance program, which must include effective testing and validation measures for compliance with applicable laws.

47.     Until these plans for reform are approved by the Federal Reserve Board and the implementation of those reforms pass independent review by a third-party

auditor, Wells Fargo and WFC are subject to an asset cap that restricts the company from growing larger. As one banking expert told the New York Times, Wells Fargo "is lucky it is too big to shut down." "A smaller bank might have lost its banking licenses."[2]

48.     A few months after the Federal Reserve's 2018 cease and desist order, and facing the prospect of review by a third-party auditor, Wells Fargo finally disclosed the 2013 error—first to its shareholders in WFC's Q2 2018 Form 10-Q and then to the borrowers who were denied mortgage modifications, many of whom lost their homes as a result of the error. WFC wrote in its 10-Q that approximately 625 customers were incorrectly denied a loan modification between April 12, 2010, and October 20, 2015 (when the error was corrected), and that approximately 400 of those instances resulted in a foreclosure. WFC also wrote that it had "accrued $8 million to remediate customers," which amounts to an average of only $12,800 per customer.

49.     Three months later, in its next Form 10-Q, WFC disclosed that Wells Fargo had discovered related errors that affected approximately 245 more customers who were incorrectly denied a mortgage modification between March 15, 2010, and

---

[2] "Federal Reserve Shackles Wells Fargo After Fraud Scandal", New York Times February 2, 2018 (Emily Flitter, Binyamin Appelbaum and Stacy Crowley), https://www.nytimes.com/2018/02/02/business/wells-fargo-federal-reserve.html.

April 30, 2018, when Wells Fargo's claims "new controls were implemented." These related errors raised the number of affected customers to approximately 870 and the resulting wrongful foreclosures to approximately 545.

50.   Wells Fargo's long-overdue review of its automated mortgage modification software is apparently still not complete. In its recently filed 10-K Annual Report, WFC disclosed to shareholders that the "effort to identify other instances in which customers may have experienced harm is ongoing, and it is possible that we may identify other areas of potential concern."

51.   To compound matters during his testimony on March 12, 2019 in the United States House of Representatives Financial Services Committee, then CEO Timothy Sloan had the following exchange with Rep. Joyce Beatty:

> In your 10-Q filing from August 2018, your company stated that "an internal review of the Company's use of a mortgage loan modification underwriting tool identified a calculation error that affected certain accounts that were in the foreclosure process between April 13, 2010 and October 20, 2015 when the error was corrected. Additionally the filing stated, "as a result of this error, approximately 625 customers were incorrectly denied a loan modification . . . in approximately 400 of these instances, after the loan modification was denied or the customer was deemed ineligible to be offered loan modification, a foreclosure was complete." Wells Fargo later updated those numbers to 870 customers who were incorrectly denied a loan and your company had improperly foreclosed on 545 of these customers.

16

> What explains the gap between identifying the error in
> October 2015 and disclosing the error nearly 3 years later
> in August of 2018?
>
> **Response of Timothy Sloan:** Wells Fargo did not
> disclose the calculation error in the Home Preservation
> Application ("HPA") tool in October 2015 because a
> review of a sample of accounts at that time showed the
> error had not harmed customers. In 2018, while reviewing
> an unrelated issue, Wells Fargo re-reviewed the HPA tool
> error and determined that, in fact, it had impacted loan
> modification decisions between April 2010 and October
> 2015. Wells Fargo then disclosed this information in its
> second quarter 10-Q filing in August 2018.

52.     As a result of the OCC's continued investigations and resulting consent

orders, Wells Fargo was and is on notice of serious errors, deficiencies, and unsafe

and unsound practices in its loan servicing, modification, and foreclosure processes

and practices from 2010 through the present. Wells Fargo was and is likewise aware

of the need for oversight, testing and auditing of those processes and practices,

including the need for oversight, testing, and auditing of automated tools. Yet Wells

Fargo has habitually failed to adopt adequate oversight, testing, and auditing.

53.     Wells Fargo's deficiencies, unsafe and unsound practices, and failure

to conduct adequate oversight, auditing, and testing, resulted in a number of systemic

automated calculation errors that greatly affected borrowers.

54.     From 2010 through 2019, Wells Fargo utilized automated mortgage loan modification underwriting tools to determine what default borrowers are qualified for a mortgage loan modification or repayment plan.

55.     On information and belief, Wells Fargo repeatedly failed to test and audit its automated mortgage loan modification underwriting tool, despite the OCC investigations and consent decrees putting it on notice of significant issues with its mortgage practices. Wells Fargo likewise failed to adequately verify that its automated mortgage loan modification tools and standard foreclosure practices complied with consent decree requirements, regulations, and laws.

56.     As a result, Wells Fargo's automated mortgage loan modification tool has been plagued with errors. Due to errors in the tool, Wells Fargo wrongfully failed to approve hundreds of borrowers for loss mitigation options including loan modifications and repayment plans. Most of those borrowers, including Thomas, lost their homes.

## FACTUAL BACKGROUND

57.     On or about May 1, 2002, Thomas purchased the Property. Thomas executed a note and security instrument on the Property that secures said note. From approximately December 1, 2006 to March 11, 2014, Wells Fargo was the servicer of Thomas's mortgage loan.

58.     In June 2006, Thomas fell upon hard times and missed her first mortgage payment, defaulting on her loan pursuant to the provisions in her standard-form mortgage.

59.     Thomas sought mortgage assistance from Wells Fargo throughout her default. In December 2012, she requested mortgage assistance. On or about September 3, 2013, as a result of Wells Fargo's automated calculation errors, Wells Fargo erroneously determined that Thomas was not qualified for a mortgage loan modification or temporary payment plan pursuant to the requirements of government-sponsored enterprises, the FHA, or HAMP. Wells Fargo wrongfully denied Thomas's mortgage assistance due to applying the incorrect eligibility requirements to the loan.

60.     Thomas complied with all obligations imposed by Wells Fargo. Indeed, Wells Fargo admits that, but for its accounting error, her modification request would have been granted.

61.     On December 30, 2013, U.S. Bank filed eviction proceedings in the DeKalb County Magistrate Court, Case No. 13D77536. On January 22, 2014, the court granted a Judgment for Writ. Thomas was required to move out of the Property by January 31, 2014. On February 11, 2014, the court sent the Writ to Marshals. On March 11, 2014, the Property was sold.

62.    As Thomas lost her home because of Wells Fargo's calculation errors, Wells Fargo's actions directly and proximately caused Thomas's damages. If Wells Fargo would have offered a HAMP TPP to Thomas, she would have accepted the offer because she intended to remain in her home. Thomas intended to timely and properly make every TPP payment and every permanent modification payment.

63.    As a result of Wells Fargo's failure to modify Thomas's loan and the loss of her home, Thomas was forced to pay moving expenses and rent payments and suffered significant mental anguish which affected her personal and professional relationships.

64.    On or around September of 2018, Wells Fargo sent form letters to certain consumers affected by its "calculation error." In those letters, Wells Fargo informed each consumer that, "[W]hen you were considered for a loan modification, you weren't approved, and now we realize that you should have been. We based our decision on a faulty calculation and we're sorry. If it had been correct, you would have been approved for a trial modification." ***See Exhibit 1*** ("Apology Letter to Thomas").

65.    The Apology Letter to Thomas was the first time Thomas learned that Wells Fargo had committed an accounting error and that her modification request should have been approved. Never in the years since taking her home did Wells

Fargo attempt to discuss with Thomas its accounting error or its wrongful failure to provide mortgage assistance.

66.    Although Wells Fargo's apology letters state that it "now realize[s]" it has made an error causing it to wrongfully fail to approve the consumer's modification, Wells Fargo's August Report demonstrates that it has known about the error since at least August 2013.

67.    In Wells Fargo's apology letters, Wells Fargo encloses a payment "to help make up for [the borrower's] financial loss." *See Exhibit 1*. The enclosed payment is an arbitrarily chosen modicum of the damages suffered by the borrower as a result of modification denial and resulting foreclosure. Neither the payment nor the apology letter is accompanied by a release. *See Exhibit 1*. Indeed, through the apology letters, Wells Fargo encourages the borrower to cash the enclosed payment, and offers to attend additional mediation with the borrower (regardless of whether the borrower cashes the check) if the borrower does not believe that Wells Fargo has "made things right." Thomas does not believe the payment was anywhere near sufficient to compensate her for the harm she suffered as a result of Wells Fargo's wrongful practices.

68.    Wells Fargo's apology letters also enclose a "Mediation Request Form" which states that the enclosed payment is available even if the borrower chooses to

mediate. *See Exhibit 2* ("Thomas's Mediation Request Form"). The Mediation Request Form also states that the borrower is "not waiving any legal claims by participating in the process." *See Exhibit 2*.

69.     Through Wells Fargo's apology letters, Wells Fargo also states that it is "also reaching out to the consumer reporting agencies to ask them to remove any negative reporting." *See Exhibit 1*.

70.     In short, Wells Fargo's apology letters admit that its accounting error caused borrowers harm, caused borrowers to be wrongfully denied a loan modification, and resulted in inaccurate negative reporting to consumer reporting agencies that should be corrected. Wells Fargo admits that it had done nothing prior to September 2018 to remediate borrowers and remove negative and inaccurate credit reporting.

71.     Despite knowing that its automated errors harmed borrowers (and admitting in its apology letters that it was appropriate to request consumer reporting agencies remove any negative reporting), Wells Fargo made no effort before October 3, 2018 to rescind the inaccurate and negative information reported to credit reporting agencies regarding consumers affected by the automated errors. *See Exhibit 3* ("Wells Fargo Credit Reporting Letter received by Thomas").

72.     Wells Fargo's repeated refusal to provide mortgage assistance (to which Thomas was entitled), Wells Fargo's refusal to correct its error after identifying its automated calculation errors, along with the loss of her home, caused Thomas significant stress and anxiety. Thomas's credit suffered as a result of Wells Fargo's refusal to modify her loan, Wells Fargo's reports to consumer reporting agencies, and the eviction action. Thomas suffered opportunity costs and lost her home, as well as the equity, appreciation, and associated tax benefits. Thomas wrongfully lost the opportunity to receive HAMP incentive payments and other methods of curing her default (including refinancing options) were affected by negative credit reporting. Thomas also suffered damages related to the loss of time and money spent in an effort to avoid foreclosure, loss of time and money put into her home, loss of time and money to find new housing and move her family loss of favorable interest rates or other favorable loan terms, and emotional distress. The exact monetary value of damages suffered by Thomas as a result of Wells Fargo's wrongful practices is unknown at this time.

## **TOLLING ALLEGATIONS FOR ALL COUNTS**

73.     The causes of action alleged herein by Thomas against Wells Fargo did not accrue or were tolled until Thomas discovered, or could have discovered with the exercise of reasonable diligence, the facts giving rise to her legal claims. Based

upon the allegations contained herein and the apology letters, the earliest Thomas
could have learned of potential claims was September 24, 2018. *See Exhibit 1.*

74.     Based on all of the foregoing, Thomas had no realistic possibility, until
receiving the apology letter, to know that:

  a.     She qualified for a trial modification; and

  b.     She was denied wrongfully for a trial modification based on a
         miscalculation done by Wells Fargo's automated decision-
         making tool that was exclusively under the control of Wells
         Fargo at all times (as it remains).

75.     Based on all of the foregoing, Thomas had no realistic ability to
discover any facts only known to Wells Fargo regarding the wrongful denial for the
mortgage modifications submitted between 2010 and 2015. Wells Fargo's
automated decision-making tool is not public, and the mathematical calculations
used to determine eligibility for any mortgage modification depend solely on
variables within Wells Fargo's exclusive control or information provided
exclusively to Wells Fargo.

76.     Based on the foregoing, any applicable statutes of limitations were
tolled by Wells Fargo's knowing, active, and ongoing concealment of the facts
alleged herein. Wells Fargo discovered at least one, if not multiple, software errors

24

back in August 2013 which contributed to the wrongful denial of Thomas's eligibility for a trial modification.

77.     Based on all of the foregoing and each 10-Q issued by WFC since August 2018, Wells Fargo deliberately concealed any information regarding the wrongful denial until September 24, 2018. Wells Fargo has a continuous duty to disclose the truth to Thomas and based upon the actions herein, Thomas reasonably relied on Wells Fargo's ongoing concealment until taking the actions to procure discovery described herein.

**COUNT ONE**
**BREACH OF CONTRACT**

78.     Thomas restates and incorporates all of her statements and allegations contained in paragraphs 1 through 77, in their entirety, as if fully rewritten herein.

79.     Thomas entered into a contract with Wells Fargo. The terms of the contract are set forth in the uniform borrower assistance form (the "Form Contract"). The Form Contract is a standard form document containing identical provisions as required by GSEs, HUD, and HAMP.

80.     The Form Contract required Thomas to (among other things) certify under penalty of perjury that the information she provided is truthful, provide authority to investigate her financial status, and agree to credit counseling.

81.     In consideration, Wells Fargo agreed through the Form Contract to evaluate Thomas for a temporary payment plan or modification program in compliance with the GSE, HUD, and HAMP requirements. Wells Fargo agreed through the Form Contract to offer Thomas the best temporary payment plan or modification program for which she was eligible.

82.     The Form Contract governs the relationship between Thomas and Wells Fargo with regard to the temporary payment plan and modification programs pursuant to GSE, HUD, and HAMP requirements and incorporates by reference those GSE, HUD, and HAMP requirements. The Form Contract is signed by Thomas.

83.     Thomas provided documents, information, and certifications in compliance with the Form Contract.

84.     As a result, Wells Fargo considered Thomas for the temporary payment plan and modification programs. Thomas was eligible for a GSE, HUD, or HAMP temporary payment plan or loan modification. But Wells Fargo did not offer Thomas any temporary payment plan or loan modification. Wells Fargo failed to do so because of a faulty automated calculation. Had that automated calculation been correct, Thomas would have been approved for a trial modification. Wells Fargo breached its obligations to Thomas under the Form Contract.

26

85.     Wells Fargo's breach impacted Thomas at a time when she was experiencing extreme hardship. As a result of the faulty automated calculation, Wells Fargo did not offer Thomas a trial modification and incorrectly provided negative credit information to consumer reporting agencies. Ultimately, Thomas lost her home as a result of Wells Fargo's breach.

86.     In addition to the express and incorporated terms of the Form Contract, the law implies a duty of good faith and fair dealing to which Wells Fargo owed to Thomas.

87.     Wells Fargo claims to have discovered its "first" automated calculation error on or before October 2, 2015, despite actually discovering the error in 2013. While Fargo states that it fixed the first automated calculation error on October 2, 2015, it failed to disclose the error to the public until August 3, 2018, and failed to disclose the error to individuals it affected until September 2018. Despite admitting its error and that its error caused Thomas to suffer significant harm, Wells Fargo did nothing for almost three years to mitigate the harm it caused to Thomas, keeping the accounting error a secret. On information and belief, Wells Fargo continued to foreclose on Thomas's home and failed to offer a trial modification plan to Thomas after discovering its automated calculation error. Wells Fargo breached the duty of good faith and fair dealing it owed to Thomas.

88.     Wells Fargo discovered its "second" automated calculation error on or before April 30, 2018. While Wells Fargo states that it "implemented new controls" on April 30, 2018, it failed to disclose the error to the public until November 6, 2018. Despite admitting its error and that its error caused Thomas to suffer significant harm, Well Fargo has done nothing to mitigate the harm it caused to Thomas. Wells Fargo breached the duty of good faith and fair dealing it owed to Thomas.

89.     Wells Fargo also breached the duty of good faith and fair dealing it owed to Thomas by failing to maintain adequate procedures in support of its automated modification eligibility review programs.

90.     Thomas was injured by Wells Fargo's breach of the Form Contract and suffered actual damages in an amount to be proven at trial, as plead, *supra*, at ¶ 72.

## COUNT TWO
## INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

91.     Thomas restates and incorporates all of her statements and allegations contained in paragraphs 1 through 77, in their entirety, as if fully rewritten herein.

92.     Wells Fargo engaged in extreme and outrageous conduct as alleged herein. Wells Fargo repeatedly failed to properly verify or audit mortgage modification software on which its customers' homes and wellbeing depended. It allowed systematic errors to persist for five to eight years; ignored consent decrees requiring it to reform its mortgage modification and foreclosure practices; failed to

reform its verification and auditing practices even after the government found a software error had led Wells Fargo to wrongfully deny mortgage modifications; concealed its discovery of an additional software error from regulators and customers; and failed to identify other related errors for an additional three years.

93.     The same extreme and outrageous conduct that caused a series of scandals and consumer abuses within Wells Fargo—leading the government to impose billions of dollars in fines and to forbid Wells Fargo from growing until reforms were implemented—was also responsible for Thomas losing her home here. Wells Fargo's board and executive leadership abandoned their oversight responsibilities to a shocking degree, repeatedly ignoring compliance failures, government fines, and consent decrees requiring leadership to implement appropriate auditing and compliance procedures.

94.     With regard to Wells Fargo's mortgage modification and foreclosure processes in particular, Wells Fargo's board and executive leadership repeatedly failed to ensure Wells Fargo conducted the necessary testing and audits to detect and promptly remedy any violations of HAMP or other government requirements. Wells Fargo's leadership ignored its oversight responsibilities even after the government found it had not adequately overseen Wells Fargo's mortgage modification and foreclosure operations, even after it agreed to implement proper oversight as part of

two 2011 consent orders, and even after the government found in 2015 that Wells Fargo had continuously failed to comply with the consent. Leadership so flagrantly and repeatedly disregarded its oversight responsibilities that the Federal Reserve imposed an asset-restriction on Wells Fargo, under which it will be prohibited from growing unless and until it reforms its oversight and governance.

95.     Wells Fargo acted with reckless disregard for the probability that its conduct would cause emotional distress to Thomas who was wrongfully denied a trial loan modification and foreclosed upon.

96.     As a direct and proximate result of Wells Fargo's conduct, Thomas has suffered both monetary losses and emotional distress as plead, *supra*, at ¶ 72.

97.     The emotional distress suffered by Thomas was so severe that no reasonable person could be expected to endure it.

98.     At least one Federal Court has found that the actions of Wells Fargo plausibly state a claim for intentional infliction of emotional distress under California law which has substantially similar elements as the claims being brought by Thomas. *See Hernandez, et al. v. Wells Fargo Bank, N.A.*, Case No. 18-cv-07354-WHA, (CD Cal.) Dkt. No. 87, June 3, 2019 Order on Motion to Dismiss at p. 11.

99.     In *Hernandez*, the court stated:

> The complaint alleges that Wells Fargo repeatedly failed
> to test the automated decision-making tool it used to

30

determine borrowers' eligibility for mortgage modifications, even in the face of a consent decree which put Wells Fargo on notice that it needed to implement such testing. Moreover, as alleged in the complaint, Wells Fargo went so far as to conceal its discovery of systemic errors from regulators and borrowers for several years. Plaintiffs allege that Wells Fargo knowingly and repeatedly refused to address these problems, deliberately deciding to put profits and growth over compliance. As a result, plaintiffs (and hundreds of other borrowers) lost their homes and suffered severe emotional distress. Wells Fargo was happy to receive HAMP money but when it came time to actually deliver on loan modifications, it systematically turned homeowners out into the streets through an alleged pattern of reckless and heartless "errors" and "cover-ups." This order cannot say as a matter of law that Wells Fargo's conduct, as currently pled, could not be deemed outrageous. That issue will need to be considered after the facts are developed in discovery.

*Id.*; *see also Symonds v. Mercury Sav. & Loan Ass'n*, 225 Cal. App. 3d 1458 (1990).

100.    The damage to Thomas was foreseeable because Wells Fargo knew Thomas would lose her home after it improperly denied her for a trial loan modification. Wells Fargo was simultaneously pursuing a foreclosure and reviewing Thomas's eligibility for a trial loan modification.

101.    As Wells Fargo's conduct was willfully and wantonly reckless or malicious, Thomas is entitled to punitive damages.

**COUNT THREE**
**WRONGFUL FORECLOSURE**

102.    Thomas restates and incorporates all of her statements and allegations contained in paragraphs 1 through 77, in their entirety, as if fully rewritten herein.

103.    "Powers of sale in deeds of trust, mortgages, and other instruments shall be strictly construed and shall be fairly exercised." O.C.G.A. § 23-2-114.

104.    Wells Fargo owed Thomas a duty to exercise the power of sale afforded it by Thomas's security instrument in conformance with the terms of the security instrument and in good faith.

105.    Wells Fargo breached its duty by foreclosing on Thomas's home without first giving Thomas notice that she could cure her default by accepting and performing on a trial loan modification. Wells Fargo was required to do so under the terms of the security instrument. Alternatively, foreclosing on Thomas's home without first offering her a trial loan modification to which she was entitled constitutes bad faith and unfair execution of the Wells Fargo's power of sale.

106.    As a direct and proximate result of Wells Fargo's conduct, Thomas has suffered both monetary losses and emotional distress as plead, *supra*, at ¶ 72.

107.    Thomas seeks compensatory damages as well as punitive damages against Wells Fargo, whose conduct evidences a willful, wanton, and reckless disregard for Thomas's rights.

## COUNT FOUR
## FRAUDULENT CONCEALMENT

108.    Thomas restates and incorporates all of her statements and allegations contained in paragraphs 1 through 77, in their entirety, as if fully rewritten herein.

109.    Wells Fargo knew starting in 2013 that its software tool was yielding inaccurate determinations as to whether borrowers qualified for a modification, but hid that fact from borrowers. Instead, Wells Fargo sent Thomas a letter stating that her request for a modification had been denied, and made no mention of the real cause of the denial: inaccurate attorneys' fees inputs in the software Wells Fargo was using to calculate eligibility for modifications.

110.    Wells Fargo misrepresented to Thomas her eligibility for modification options. Moreover, Wells Fargo actively and knowingly concealed for years its automated calculation errors. On information and belief, despite discovering those errors, Wells Fargo continued to conduct foreclosures and issue notices of default regarding properties and consumers affected by those errors.

111.    Thomas's modification eligibility was of the utmost importance. Her eligibility for a modification—as well as the automated errors erroneously determining her to be ineligible for modification—were material to Thomas.

112.    Wells Fargo knew or should have known about its automated calculation errors and, therefore, Thomas's true eligibility for modifications. Wells Fargo either knew about its automated calculation errors and actively concealed

33

them, as well as their effects, or Wells Fargo should have known of the errors, but acted with utter disregard and recklessness. Wells Fargo was on notice since as early as 2010 of seriously deficient, unsafe, and unsound practices in its loan servicing, modification, and foreclosure programs. Despite committing in multiple consent cease and desist orders to do so, Well Fargo failed to adopt adequate controls, including necessary oversight, auditing, and testing procedures. In short, despite repeated reminders of its erroneous servicing, modification, and foreclosure practices and tools, Wells Fargo elected to put profits and growth over compliance.

113.   Wells Fargo had a duty to disclose the software error – a material fact – to Thomas. By informing Thomas that she was denied a trial loan modification, but not that her denial was based on calculations made by software Wells Fargo knew to be faulty, Wells Fargo stated half-truths. One who undertakes to make a statement must not only state the truth, but may not conceal any facts within his knowledge which materially qualifies his statement. Since Wells Fargo chose to speak in stating that Thomas did not qualify for a modification, it was required to make a full disclosure. This is particularly true because Wells Fargo had superior knowledge as to all material facts surrounding Thomas's eligibility for a trial loan modification.

114.    By wrongfully communicating to Thomas her purported ineligibility for a trial loan modification and by actively concealing from her, other borrowers, the public, and government regulators known calculation tool errors and compliance deficiencies, Wells Fargo intended to provoke Thomas's reliance on its misrepresentations and omissions.

115.    Thomas relied upon Wells Fargo's misrepresentations and omissions. That reliance was justified, particularly given that Wells Fargo had in its power all of the tools necessary to determine eligibility for a trial loan modification. Thomas had neither the sophistication nor tools to check Wells Fargo's misrepresentations and omissions regarding her trial loan modification eligibility and calculations.

116.    Had Wells Fargo disclosed the whole truth to Thomas, she would have been able to seek review of the incorrect decision on her trial loan modification eligibility by a competent third party, such as an attorney, agency, or other organization or individual with knowledge of mortgage modification requirements and processes. Thomas would then have become aware that the denial was erroneous, and would have been able to prevent the wrongful foreclosure and other harm that flowed from Wells Fargo's error.

117.    As a direct and proximate result of Wells Fargo's conduct, Thomas has suffered both monetary losses and emotional distress as plead, *supra*, at ¶ 72.

## JURY DEMAND

118.   Plaintiff Rochelle V. Thomas hereby requests a trial by jury on all issues, with the maximum number of jurors permitted by law.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff Rochelle V. Thomas prays that this Court enter its order granting judgment against Defendant Wells Fargo Bank, N.A. for the following:

A.   Actual damages in excess of $75,000.00 in an amount to be determined at trial as to Counts One through Four;

B.   Punitive damages as to Counts Two through Four; and

C.   Such other relief as this Court deems appropriate.

Respectfully submitted, this 10th day of January, 2020.

*Signature page follows*

**BERRY AND ASSOCIATES**

*/s/Adam J. Klein*

Adam Klein
Georgia Bar No. 425032
*aklein@mattberry.com*

Berry & Associates
2751 Buford Highway, Suite 600
Atlanta, Georgia 30324

OFFICE    (404) 235-3305
FAX        (404) 235-3333

Local Counsel for Plaintiff


Brian Flick
*Pro hac vice* application to be filed
*bflick@dannlaw.com*

DannLaw
2181 Victory Parkway, Suite 101
Cincinnati, Ohio 45206

OFFICE    (216) 373-0539
FAX        (216) 373-0536

Counsel for Plaintiff

Marc Dann
*Pro hac vice* application to be filed
*mdann@dannlaw.com*

DannLaw
2728 Euclid Ave, Suite 300
Cleveland, Ohio 44115

OFFICE    (216) 373-0539
FAX        (216) 373-0536

Counsel for Plaintiff